[Civ. No. 3838. Third Appellate District.—October 8, 1929.]

MERCED IRRIGATION DISTRICT, Respondent, v. SAN JOAQUIN LIGHT AND POWER CORPORATION, Appellant.

Murray Bourne, F. H. Pearson and Thelen & Marrin for Appellant.

Downey, Brand & Seymour, Stephen W. Downey and George W. Mordecai for Respondent.

THOMPSON (R. L.), J.—This is an appeal from a judgment upon a contract for the sale and delivery of electric energy.

The respondent is an irrigation district organized and operating under the California Irrigation Act. The appellant is a public utility corporation organized for the purpose of supplying consumers with electric power and light. In February, 1924, the respective parties executed a written contract by the terms of which the appellant agreed to purchase from respondent the entire output of a 25,000 .

kilowatt hydroelectric generating plant for a term of twenty years at 4½ mills per kilowatt. The contract provided in part: "Irrigation District expects and intends hereafter to construct, operate and maintain a storage reservoir . . . and a hydroelectric generating plant of-about 25,000 kilowatts capacity at or near Exchequer on the Merced River, . . . The parties hereto agree as follows: 1. Irrigation District undertakes and agrees [to] . . . sell to Power Company the entire electric output thereof, . . . and Power Company upon its part agrees . . . to receive, accept and pay for such electric output. 2. (a) All electric energy to be delivered and received pursuant to this agreement shall be three phase, sixty cycle, alternating current. . . . Power Company agrees that it will receive *said* electric energy to the total output possible from the water passing through said plant, whether from storage or natural flow, . . . but reserves the right to vary the power factor within the ampere and excitation capacity of the electric generators; but at no time shall Power Company require the operation of the plant at a power factor which will act to reduce the electric energy that could be generated by the available water. . . . "

In due time the plant was constructed by building a concrete dam across the Merced River which formed a reservoir impounding the water, from which it flowed in two units through gates, penstocks and turbine-wheels to the generators. This water-power had a variable head with a maximum depth of 300 feet, but the average head was 240 feet. The plant was constructed with two complete units. The manufacturer's rating of each of these units as indicated by the label plates attached to each of the generators was "15,625 K.V.A. (kilovolt amperes) at 8–10 power factor." Expert witnesses testified this meant each of these generators operated at eighty per cent power factor would produce 12,500 kilowatts of electric energy per hour, with a capacity of 15,625 kilowatts when operated at unity which is full power factor. This gives the combined units a possible capacity of 31,250 kilowatts. Testimony was adduced indicating that these generators were designated by the manufacturer and known to the trade to be 12,500 kilowatt machines, and were intended to be operated at eighty per cent power factor, allowing the remaining possible twenty

per cent of its maximum capacity as a safety margin to prevent overloading and consequent danger of burning out the coils and damaging the machinery. It is a mere matter of mathematical calculation to determine that the combined output of two electric units designated as 12,500 kilowatt generators operated at only eighty per cent of their power factor would produce 31,250 kilowatts when operated at full capacity. Mr. Barre testified that ''The kilowatt capacity of a plant is the load which that plant can deliver as a maximum under all the conditions of operation existing at the site.'' ■ The statements to the effect that these two units combined were designated by the manufacturer and known by the trade to constitute a 25,000 kilowatt plant operated at 8–10 power factor, with a possible capacity of 31,250 kilowatts, was contradicted by appellant's expert witnesses. This conflict, however, must be resolved in favor of the judgment.

The evidence based upon the daily log records of the plant indicates that the average output which was actually generated by the plant during a period of 329 days from July 1, 1927, to July 1, 1928, was 23,844 kilowatts; except that for a brief period of about six days, when the head of the water supply was at a maximum height of 300 feet and conditions were most favorable, the plant developed 32,400 kilowatts. At no other time did the plant exceed its maximum capacity of 31,250 kilowatts.

It was stipulated that pursuant to the foregoing contract the respondent generated in 1927 and transferred to the appellant's power lines a total quantity of electric energy aggregating 126,588,850 kilowatt hours; that between April 1 and August 31, 1927, respondent produced 86,655,470 kilowatt hours, which last-mentioned figures contained an output of 13,630,180 kilowatts in excess of 25,000 kilowatt hours, and which entire output was fully paid for according to the terms of the contract except said amount of 13,630,180 kilowatts, which at 4½ mills per kilowatt was valued at $61,396.23. This sum was not paid. For this amount the jury rendered a verdict in favor of respondent and a judgment was entered accordingly.

The vital questions to be determined in the present case are, what is the maximum capacity of a hydroelectric generating plant commonly termed a 25,000 kilowatt plant?

Was the reference to a plant of this character a limitation of agreement to purchase only 25,000 kilowatts, or was it merely descriptive of the general character of a plant, the entire output of which was bargained for?

The appellant contends that it contracted to purchase only a maximum of 25,000 kilowatt hours of electric energy, instead of the entire output of the plant, and that it has fully paid respondent to the extent of its obligation. Its position is concisely stated as follows: "The Power Company's obligation is limited to its agreement to take and pay for the output of *said* plant, and *said* plant is referred to as a plant to be constructed by the Irrigation District and to be a plant of *about 25,000 kilowatts capacity.*" It must be conceded that the parties contracted with relation to the output of a hydroelectric plant of "about 25,000 kilowatts capacity," but that the appellant clearly agreed to purchase "the total output from the water passing through said (25,000 kilowatt) plant," and that at no time would the appellant "require the operation of the plant at a power factor which will act to reduce the electric energy that could be generated by the available water."

The chief controversy centers around the application of the words "about" and "capacity" as they are employed in the contract.

The energy which may be produced by a hydroelectric plant depends upon the capacity of the plant and the power factor which is derived from the water supply. The term "power" means the rate at which the work of transforming or producing the energy is performed. The amount of work which is performed in a given period of time is therefore the unit of power. In mechanics the rule adopted by James Watt is still accepted as the basis upon which to measure power. He estimated that the "horsepower unit" was equivalent to 33,000 foot-pounds of work per minute. This is still the rule in steam or hydraulic engineering. The term "watt" as it is used in electrical engineering is the rate at which the work is performed in an alternating circuit with a current of one ampere and an electromotive force of one volt. Seven hundred and forty-six watts are equivalent to one horse-power. The power factor of such a plant as the one which is involved in this case depends upon the capacity of the generating apparatus

and the head and velocity of the water supply which furnishes it power. Assuming that a hydroelectric plant of 25,000 kilowatts supplied with a water power at a head of 240 feet, operated at eighty per cent power factor, would produce 31,250 kilowatts when operated at unity, or one hundred per cent power factor, the maximum output clearly would be 31,250 kilowatts, in spite of the fact that it was commonly termed and known to the trade as a 25,000 kilowatt plant. The appellant, which is a public utility corporation engaged in supplying its customers with electric power and light, and which knew of respondent's plans for the construction of the reservoir with a maximum head of 300 feet must be presumed to have known and contracted with relation to a variable and not a static head, and that the output of such a plant would necessarily fluctuate, in a measure which would be dependent upon the season, the quantity of water in the storage reservoir and surrounding conditions. It must also have been deemed to have contracted for the entire output of the plant of 25,000 kilowatts capacity,'' with knowledge that the trade commonly referred to such a plant at eighty per cent only of its possible output, and that it might be capable of producing 31,250 kilowatts. The appellant therefore should be required to accept and pay for the entire actual output of the plant within the maximum figure of 31,250 kilowatts. It is not disputed that the entire output for which the judgment in this case was rendered was within this amount except that for a period of a few days 32,400 kilowatts were produced. This slight excess of 1150 kilowatts over the maximum estimated output of the plant for a few days only comes within the rule of *de minimis non curat lex* and may be included within the definition of the word ''about'' as it was used in the contract. (35 Cyc. 206; 23 R. C. L. 1352, sec. 176.) This slight excess is not sufficient variance to defeat the respondent's claim.

The foregoing conclusion is based upon the technical meaning of the phrase which is used in the contract, to wit, ''a plant of about 25,000 kilowatt capacity,'' as it was construed by respondent's expert witnesses. The word ''capacity'' does ordinarily mean the maximum ability to retain contents or perform work. But we think this is too narrow a definition for the purpose of construing the con-

tract in the present case. It is not unreasonable to assume that the electrical trade may designate a generating plant by reference to the approximate load which it is ordinarily designed to produce with a twenty per cent margin of safety and a thorough understanding that under favorable conditions its maximum capacity may be increased to that extent. In the same sense a vessel is described as one of 5,000 tons burden, or a truck as one of ten tons capacity. A contract to purchase the entire cargo of the first or load of the latter would not necessarily limit the obligation to the mere figures employed in the description of the conveyance.

█ While it is ordinarily the province of the court to construe the language of a contract, there are so many scientific factors involved in determining the kilowatt capacity of an electric generating plant that it becomes a proper subject for expert testimony. (*United States Heater Co.* v. *Jenss*, 128 Wis. 162 [107 N. W. 293].) █ It became a question for the determination of the jury as to whether the term ''capacity'' was used in its ordinary sense or in a technical trade sense. Nor do we think that a fair construction of the record binds the respondent to a stipulation that it was employed only in its ordinary sense. It is true that in a lengthy controversy between respective counsel and the court, Mr. Downey, one of respondent's attorneys, addressing himself to the court, did say: ''I might call your Honor's attention to the fact that the directors of the Merced Irrigation District were not electrical engineers and when they used the term 'capacity' in a contract, they are using it as ordinary men understand it, not as some handbook of the American Institute of Electrical Engineers may follow. That is the question for the jury.'' The entire colloquy and the chief issue in the case were with respect to the import and intended meaning of the term ''an electric plant of about 25,000 kilowatt capacity.'' Following the foregoing remark of counsel, in response to Mr. Pearson's effort to construe this into a binding stipulation against respondent, Mr. Downey denied his intention to so stipulate, saying: ''Well, I hadn't been aware of the fact I had conceded anything . . . '' █ An impulsive statement of counsel against interest which is made in the turmoil of trial, and appears not to have been intended, will not bind the client.

■ The appellant contends that even though the plant which was installed by the respondent was originally one of 25,000 kilowatts operated at eighty per cent power factor, that changes were subsequently made by the respondent, including the substitution of mica for cotton insulation to permit the increase of temperature without burning out the coils; a two-inch increase of diameter of the water-wheel shafts to enable them to carry a heavier load, and a cooling system to lower the temperature of the water in the reservoir, each of which was designed to increase the maximum capacity of the plant. The appellant introduced expert testimony to show that these changes did actually increase the capacity of the plant to a maximum output of from 36,000 to 39,000 kilowatts. This testimony was disputed by the respondent, in proof of which contradiction it was pointed out that the highest output of the plant under most favorable conditions was but 32,400 kilowatts for a period of only a few days. It seems immaterial, however, whether changes were made which actually resulted in the possibility of increasing the capacity to an amount of energy in excess of the maximum output of a 25,000 kilowatt plant, so long as that result was not accomplished, and the appellant is not asked to accept or pay for electric energy beyond the maximum product of a 25,000 kilowatt plant. The appellant did not contract for the output of a specific machine. The quality or character of the electric energy is not questioned. The quantity is the only element in dispute. The appellant merely bargained for a quantity of electric energy equivalent to the maximum output of a plant of about 25,000 kilowatts. The appellant is not harmed, nor may it complain if a quantity of electricity less than the maximum amount contracted for was actually generated in a 39,000 kilowatt plant instead of a 25,000 kilowatt plant.

■ The appellant charges error in the giving and refusing of certain instructions. Instruction number 7, which is challenged, was given as follows: "You are instructed, therefore, that it is your duty to determine whether or not the power house constructed by the Merced Irrigation District is of a capacity of about 25,000 kilowatts, and if you so find, then you must further find that under the provisions of the contract in evidence, defendant is and was bound to accept the entire electrical output therefrom." This was

a correct declaration of the law. It was a question of fact as to whether a plant which was capable of producing 31,250 kilowatts per hour operated at unity power factor was in truth such a 25,000 kilowatt plant as was referred to in the contract. Upon this point the evidence was conflicting. Expert witnesses disagreed as to this issue. It therefore became a question of fact for the jury to determine. There is no dispute over the fact that if it was a 25,000 kilowatt plant according to the contract the appellant would be required to accept and pay for the entire output. Incidentally, it was also the province of the jury to determine whether the changes which were made in the machinery had the effect of increasing the kilowatt capacity of the plant, although the state of the record would seem to make it immaterial whether the modifications did in fact change the capacity of the plant, as heretofore suggested.

 Error is charged in the refusal to give appellant's instruction number 3, which included the following statement: " . . . The word (about), however, must not be understood by you to permit of more than a small or slight departure from the amount named in the contract of *25,000 kilowatts.* . . . " This instruction is erroneous since, in view of the record, it leaves out of consideration the maximum possible production of a 25,000 kilowatt plant operated at unity factor so as to actually generate 31,250 kilowatts per hour. The instruction limits the variation to only a slight departure from the figure of 25,000, rather than the maximum output of a "25,000 kilowatt plant." It was therefore not error to refuse to give this instruction.

 Appellant's instruction number 2 was also refused. It is a correct definition of the word "capacity," but would be misleading in view of the state of the record, unless its application were explained. It reads as follows: "In determining the question as to what is the kilowatt capacity of the power house of the Merced Irrigation District, you are instructed that the word 'capacity' shall be taken by you to mean, as it is applied to the facts in this case, the number of kilowatts which the power house is capable of generating or producing. In other words, the word 'capacity' means the measure of the maximum ability of the power house to produce kilowatts."

While this is a true statement or definition of the word "capacity," standing alone, it was not necessarily the maximum capacity of the particular Merced power plant as it stood, which determined appellant's obligation under the contract. That power plant was not yet constructed when the contract was executed. Upon the contrary, it was the maximum capacity of a plant equivalent to one which is ordinarily termed a "25,000 kilowatt plant," which is involved in the present case. There was therefore no error in refusing to give this instruction.

The judgment is affirmed.

Finch, P. J., and Plummer, J., concurred.