[Sac. No. 4831. In Bank.—February 28, 1934.]

MERCED IRRIGATION DISTRICT, Respondent, v. SAN JOAQUIN LIGHT AND POWER CORPORATION (a Corporation), Appellant.

Thos. J. Straub, W. R. Dunn and F. H. Pearson for Appellant.

Hugh K. Landram, C. Ray Robinson, Stephen W. Downey and Downey, Brand & Seymour for Respondent.

THE COURT.—This action was commenced by plaintiff for declaratory relief involving its asserted rights under a contract with defendant and, as incidental to that relief, for a money judgment in the sum of $15,664.50. Judgment was rendered in plaintiff's favor and the defendant prosecutes this appeal therefrom.

On February 21, 1924, the parties to this litigation entered into a contract whereby the respondent agreed to erect and construct a hydroelectric generating plant near Exchequer on the Merced River "of about 25,000 kilowatts capacity" and the appellant agreed to purchase the electric output thereof saving and excepting only so much thereof as might be required in and about the operation of the reservoir and generating plant. Some time in June, 1926, the plant was placed in operation. Along in April, 1927, it commenced to produce in excess of 25,000 kilowatts which continued until August 1, 1927. The appellant refused to pay for energy in excess of 25,000 kilowatts output and respondent brought an action to recover $61,396.23 representing the contract price of the output in excess of 25,000 kilowatts. The appellant answered that complaint denying that it had agreed to purchase any electrical energy from respondent in excess of an output of 25,000 kilowatt hours, and alleging that respondent had failed to construct a generating plant of "about 25,000 kilowatts", but had constructed in connection with its reservoir a plant with a capacity far in excess "of 'about 25,000 kilowatts' and of a capacity of at least 32,000 kilowatts". This cause was tried before a jury which returned a verdict in favor of the plaintiff there, the respondent here. The cause was appealed and the judgment affirmed. (*Merced Irr. Dist.* v. *San Joaquin L. & P. Corp.*, 101 Cal. App. 153 [281 Pac. 415].)

Subsequent to the judgment becoming final therein and during the year 1932, the output of the plant was increased

so that for seventy-seven consecutive days it generated in excess of 31,250 kilowatts, and in fact for fifty-two consecutive days produced 33,900 kilowatt hours. The appellant has paid for all energy up to 31,250 kilowatts but has refused to pay for any in excess thereof. It is respondent's contention that in the former action it was determined that the plant was one "of about 25,000 kilowatts capacity" and that appellant is bound to take and pay for the entire output. On the other hand appellant asserts that by the former decision it was obliged to receive and make payment for all of the output "within the maximum figure of 31,250 kilowatts".

In order to understand more clearly the respondent's position it must be borne in mind that upon the issue in the former action of whether the respondent here had failed to erect a plant of about 25,000 kilowatt capacity evidence was introduced showing it consisted of two generators bearing the notation on the manufacturer's label plate " '15,625 K. V. A. (kilovolt amperes) at 8–10 power factor' ", which the expert witnesses produced by respondent testified meant that these units were designed to be ordinarily operated at eighty per cent power factor allowing the difference as a safety margin and that, if so operated, they would produce 25,000 kilowatts, but that if operated at full capacity they would produce 31,250 kilowatts. They also testified in effect that, taken together, the two units made up a plant known to the trade as one of 25,000 kilowatt capacity.

The District Court of Appeal in its opinion said: "The vital questions to be determined in the present case are, what is the maximum capacity of a hydroelectric generating plant commonly termed a 25,000 kilowatt plant? Was the reference to a plant of this character a limitation of agreement to purchase only 25,000 kilowatts, or was it merely descriptive of the general character of a plant, the entire output of which was bargained for?"

Again it is said: "The chief controversy centers around the application of the words 'about' and 'capacity' as they are employed in the contract." Eliminating some language which does not seem essential here, the court answered the questions as follows: "The appellant, which is a public utility corporation engaged in supplying its customers with electric power and light, and which knew of respondent's plans

for the construction of the reservoir with a maximum head of 300 feet must be presumed to have known and contracted with relation to a variable and not a static head, and that the output of such a plant would necessarily fluctuate, in a measure which would be dependent upon the season, the quantity of water in the storage reservoir and surrounding conditions. It must also have been deemed to have contracted for the entire output of the plant of 25,000 kilowatts 'capacity', with knowledge that the trade commonly referred to such a plant at eighty per cent only of its possible output, and that it might be capable of producing 31,250 kilowatts. The appellant therefore should be required to accept and pay for the entire actual output of the plant within the maximum figure of 31,250 kilowatts. It is not disputed that the entire output for which the judgment in this case was rendered was within this amount except that for a period of a few days 32,400 kilowatts were produced. This slight excess of 1150 kilowatts over the maximum estimated output of the plant for a few days only comes within the rule of *de minimis non curat lex* and may be included within the definition of the word 'about' as it was used in the contract. (35 Cyc. 206; 23 R. C. L. 1352, sec. 176.) This slight excess is not sufficient variance to defeat the respondent's claim.

"The foregoing conclusion is based upon the technical meaning of the phrase which is used in the contract, to wit, 'a plant of about 25,000 kilowatt capacity', as it was construed by respondent's expert witnesses. The word 'capacity' does ordinarily mean the maximum ability to retain contents or perform work. But we think this is too narrow a definition for the purpose of construing the contract in the present case. It is not unreasonable to assume that the electrical trade may designate a generating plant by reference to the approximate load which it is ordinarily designed to produce with a twenty per cent margin of safety and a thorough understanding that under favorable conditions its maximum capacity may be increased to that extent. In the same sense a vessel is described as one of 5000 tons burden, or a truck as one of ten tons capacity. A contract to purchase the entire cargo of the first or load of the latter would not necessarily limit the obligation to the mere figures employed in the description of the conveyance.

"While it is ordinarily the province of the court to construe the language of a contract, there are so many scientific factors involved in determining the kilowatt capacity of an electric generating plant that it becomes a proper subject for expert testimony. (*United States Heater Co.* v. *Jenss,* 128 Wis. 162 [107 N. W. 293].) It became a question for the determination of the jury as to whether the term 'capacity' was used in its ordinary sense or in a technical trade sense."

.    .    .    .    .    .    .    .    .    .    .

"The appellant contends that even though the plant which was installed by the respondent was originally one of 25,000 kilowatts operated at eighty per cent power factor that changes were subsequently made by the respondent, including the substitution of mica for cotton insulation to permit the increase of temperature without burning out the coils; a two-inch increase of diameter of the waterwheel shafts to enable them to carry a heavier load, and a cooling system to lower the temperature of the water in the reservoir, each of which was designed to increase the maximum capacity of the plant. The appellant introduced expert testimony to show that these changes did actually increase the capacity of the plant to a maximum output of from 36,000 to 39,000 kilowatts. This testimony was disputed by the respondent, in proof of which contradiction it was pointed out that the highest output of the plant under most favorable conditions was but 32,400 kilowatts for a period of only a few days. It seems immaterial, however, whether changes were made which actually resulted in the possibility of increasing the capacity to an amount of energy in excess of the maximum output of a 25,000 kilowatt plant, so long as that result was not accomplished, and the appellant is not asked to accept or pay for electric energy beyond the maximum product of a 25,000 kilowatt plant. The appellant did not contract for the output of a specific machine. The quality or character of the electric energy is not questioned. The quantity is the only element in dispute. The appellant merely bargained for a quantity of electric energy equivalent to the maximum output of a plant of about 25,000 kilowatts. The appellant is not harmed, nor may it complain if a quantity of electricity less than the maximum amount contracted

for was actually generated in a 39,000 kilowatt plant instead of a 25,000 kilowatt plant.

"The appellant charges error in the giving and refusing of certain instructions. Instruction number 7, which is challenged, was given as follows: 'You are instructed, therefore, that it is your duty to determine whether or not the power house constructed by the Merced Irrigation District is of a capacity of about 25,000 kilowatts, and if you so find, then you must further find that under the provisions of the contract in evidence, defendant is and was bound to accept the entire electrical output therefrom.' This was a correct declaration of the law. It was a question of fact as to whether a plant which was capable of producing 31,250 kilowatts per hour operated at unity power factor was in truth such a 25,000 kilowatt plant as was referred to in the contract. Upon this point the evidence was conflicting. Expert witnesses disagreed as to this issue. It therefore became a question of fact for the jury to determine. There is no dispute over the fact that if it was a 25,000 kilowatt plant according to the contract the appellant would be required to accept and pay for the entire output. Incidentally, it was also the province of the jury to determine whether the changes which were made in the machinery had the effect of increasing the kilowatt capacity of the plant, although the state of the record would seem to make it immaterial whether the modifications did in fact change the capacity of the plant, as heretofore suggested.''

It cannot be successfully disputed, as is evident from the foregoing recitals, that the capacity of the respondent's generating plant was one of the chief issues in the trial court as well as one of the principal questions before the appellate tribunal. The implied finding of the jury based upon a conflict in the evidence was to the effect that it was a 25,000 kilowatt capacity plant with a maximum capacity of 31,250 kilowatts. The appellate court concluded that appellant did not contract for 25,000 kilowatt hours, but contracted for the output of a plant with a maximum capacity of 31,250 kilowatts. Further, the jury determined (and upon conflicting testimony) that the alterations did not increase its capacity, and the appellate court upheld its conclusion in this particular. So far, therefore, as the prayer for declaratory relief is concerned, it would seem that the

issues had heretofore been completely litigated and determined. Construing the contract of the parties and the action of the respondent thereunder, it was found that the respondent had complied by constructing a plant contemplated by the parties and that appellant was compelled to accept the output thereof to a defined maximum. This case illustrates the reason for the rule invoked by the appellant that respondent's contentions are concluded by the former judgment. Parties should not be permitted to litigate and relitigate the same cause of action. The cases are legion and unanimous to the effect that facts once litigated and the law once pronounced upon those facts are conclusive in all subsequent proceedings involving the same subject matter.

We should have some doubts upon that phase of the case which seeks a money judgment against appellant for electrical energy already developed in excess of 31,250 kilowatts were it not for the language of the complaint. It reads: "That defendant accepted delivery of all power generated and delivered as aforesaid in 1932, up to, but not exceeding, a maximum of Thirty One Thousand Two Hundred Fifty (31,250) kilowatts." This allegation puts it beyond the power of the court to order payment on the theory that appellant accepted delivery of the excess electrical energy.

Judgment reversed.

Rehearing denied.

Curtis, J., dissented.

Preston, J., and Langdon, J., deeming themselves disqualified, did not participate in the proceeding on rehearing.